**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 4 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PAUL M. SCHWARTZ; KEVIN R.
KLUNDT; BILLY W. ROBINSON;
ANDREW E. DILWORTH; JAY L.
HATFIELD; ERIC A. JESSON;
SCOTT VESKRNA; and all other
similarly situated members of the
Brotherhood of Maintenance of Way
Employes,

     Plaintiffs - Appellants,

v.

BROTHERHOOD OF
MAINTENANCE OF WAY
EMPLOYES, and its applicable
Division; and BURLINGTON
SYSTEM DIVISION,

     Defendants - Appellees.

No. 00-8045

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 99-CV-171-B)**

---

Bruce S. Asay (Keith S. Burron with him on the briefs) of Associated Legal
Group, LLC, Cheyenne, Wyoming, for Plaintiffs-Appellants.

Charles A. Collins, St. Paul, Minnesota (Michael R. O'Donnell of Burke,
Woodard & O'Donnell, PC, Cheyenne, Wyoming, and William A. Bon of
Brotherhood of Maintenance of Way Employes, Southfield, Michigan, with him
on the brief), for Defendants-Appellees.

---

Before **TACHA**, Chief Judge, **McKAY** and **CUDAHY**,[*] Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

This appeal requires us to decide whether a union breached its duty of fair representation to several members. The district court granted summary judgment to Defendant, the Brotherhood of Maintenance of Way Employes, and dismissed the case. Plaintiffs, primarily former union members, appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

Our recitation of the facts warrants some preliminary explanation. The summary judgment posture of the case compels us to view the evidence in the light most favorable to Plaintiffs, the nonmoving party below. See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1313 (10th Cir. 1999). This evidentiary lens reveals a case teeming with genuine factual disputes. That is, a rational juror could decide the disputed factual allegations in Plaintiffs' favor based on the evidence presented. See Chasteen v. UNISA JECS Corp., 216 F.3d 1212, 1216 (10th Cir. 2000). To avert summary judgment, however, the contested facts must be material. In other words, "[o]nly disputes over facts that might affect the

---

[*]Honorable Richard D. Cudahy, United States Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

-2-

outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, if Plaintiffs' version of the genuine disputed facts demonstrates a breach of the duty of fair representation, then the dispute must be material, and summary judgment cannot lie. For purposes of this appeal, therefore, we resolve all genuine fact disputes in Plaintiffs' favor and will recite the facts accordingly, without mention of the Defendant union's contrary allegations. If the facts, thus stated, constitute a breach of the union's duty, then we must reverse and remand.

The record shows that Plaintiffs worked for the Burlington Northern-Santa Fe Railroad in the maintenance of way "craft" and belonged to Defendant union, the Brotherhood of Maintenance of Way Employees (International), represented locally by the Burlington System Division. The railroad advertised openings in the train service craft, considered a better job than maintenance of way work. A different union, the United Transportation Union, represents train service employees. Plaintiffs opted to change crafts, which necessitated approximately fifteen weeks of full-time training and successful completion of a test.

However, Plaintiffs could not simply skip their maintenance of way work to attend train service classes without consequence. Failure to report to work constituted grounds for dismissal—a risky proposition considering there was no guarantee that a trainee would ultimately qualify for train service work. Thus, to

preserve their seniority rights in Defendant union during the training period, Plaintiffs were required to obtain leaves of absence and any necessary extensions thereof for the term of their absence. All of the Plaintiffs secured an initial leave of absence of sixty or ninety days.

At some point during the train service courses, Plaintiffs heard rumors that there would not be any openings when they finished. Apparently, train service workers coming in from other parts of the country were exercising their seniority rights by taking the positions anticipated by Plaintiffs. Understandably concerned about employment prospects, Plaintiffs questioned whether they could return to the maintenance of way craft pending openings in train service. This presented a novel situation for Defendant union. Historically, craft transfers had always found work in the new craft, and no one had ever needed or wanted to return to a previous department. Moreover, the collective bargaining agreement did not completely address the Plaintiffs' question. The most relevant provision simply provided that "an employe on leave of absence accepting other employment without first obtaining written permission from the Company and the duly accredited representative of the employes will be considered as having left the service and all seniority rights will be forfeited." Appellee's Supp. App. at 122 (collective bargaining agreement, rule 15E).

When confronted with the dilemma, David Joynt, the Chairman of the

-4-

Defendant Burlington System Division union, repeatedly told Plaintiffs and/or their train service instructor, who had been investigating the issue on Plaintiffs' behalf, that by merely passing the train service exam craft transfers would lose their maintenance of way seniority, <u>regardless of whether they continued to hold valid leaves of absence</u>. Based on this representation, Plaintiffs let their leaves of absence expire while going on to complete the train service course and pass the final exam.[1] Without a valid leave, they automatically lost their positions in maintenance of way. Upon qualifying for train service work, Plaintiffs were immediately placed on furlough, a sort of waiting period allowing an employee to do whatever else he wants, even getting another job, subject to being called to work in train service when openings became available.

Several months after first learning of the craft transfer problem, Chairman Joynt arranged with the railroad to allow those employees with continuing leaves of absence from maintenance of way, who had qualified for but could not be placed in train service, to return to work in maintenance of way. This arrangement did nothing for Plaintiffs, however, who had already lost their seniority. The district court assumed, as do we on summary judgment, that but for Chairman Joynt's advice that their leaves of absence did not matter, Plaintiffs

---

[1]We note that one Plaintiff dropped out of the train service course before taking the test and began working again in the maintenance of way department. For convenience, however, we discuss all Plaintiffs as if in the same factual boat.

would have maintained active leaves and been able to return to the maintenance of way department while on furlough from train service. See Aplt. Br. App. B. at 9 (Order Granting Defendants' Motions for Summary Judgment). Plaintiffs sued Defendant union in federal district court. In relevant part, they claimed that Chairman Joynt's advice and dilatory resolution of this novel craft transfer dilemma breached Defendant union's duty of fair representation. The district court granted Defendant summary judgment.

The duty of fair representation arises from a union's legal status as the sole and exclusive bargaining representative of employees' interests with their employer. See Webb v. ABF Freight Sys., Inc., 155 F.3d 1230, 1239 (10th Cir. 1998), cert. denied, 526 U.S. 1018 (1999). From that right to represent all the members of a designated employment unit flows an "obligation to serve the interests of all members." Vaca v. Sipes, 386 U.S. 171, 177 (1967). By design, the obligation "stands 'as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law.'" DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 165 n.14 (1983) (quoting Vaca, 386 U.S. at 182). On the other hand, representing collectively a diverse constituency poses tremendous difficulties. Even the best intentioned, most thoughtful union action will almost invariably further the interests of one employee faction at the expense of another. See, e.g., Considine

v. Newspaper Agency Corp., 43 F.3d 1349, 1357 (10th Cir. 1994). Consequently, too stringent a duty of representation would subject the union to endless attacks from within, undermining the very purpose for the union's existence—to present a strong, unified front to employers. Thus, a sensible duty of fair representation must allow for the "wide latitude," Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 78 (1991) [hereinafter ALPA], that a union needs to represent collectively the varied interests of its members while at the same time protecting the individual employee's legitimate claim for redress due to unjustifiable union conduct.

The duty of fair representation attempts to accomplish both goals by making a union liable to its members for conduct that is "'arbitrary, discriminatory, or in bad faith.'" Id. at 67 (quoting Vaca, 386 U.S. at 190); see also Webb, 155 F.3d at 1240-41 (stating that "perfunctory" union conduct may be actionable in certain contexts or as a specific type of arbitrary conduct). The Supreme Court has made it clear that this duty "applies to all union activity." ALPA, 499 U.S. at 67, 77. Although specific articulations may vary slightly based on context, see, e.g., Breininger v. Sheet Metal Workers, 493 U.S. 67, 89 (1989) (explaining the duty in a union hiring hall context); Webb, 155 F.3d at 1239 (explaining scope of the duty in a grievance arbitration proceeding), the general contours of the tripartite standard are well-established.

A union's actions are arbitrary only if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." [ALPA, 499 U.S. at 67 (citation omitted)]. A union's discriminatory conduct violates its duty of fair representation if it is "invidious." Id. [at 81]. Bad faith requires a showing of fraud, or deceitful or dishonest action. Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 531 (10th Cir. 1992).

Aguinaga v. United Food & Commercial Workers Int'l Union, 993 F.2d 1463, 1470 (10th Cir. 1993), cert. denied, 510 U.S. 1072 (1994). We now turn to application of these principles to the facts outlined above.

First, we agree with the district court that the evidence, even viewed in Plaintiffs' favor, does not indicate that Chairman Joynt acted in bad faith. Indeed, Plaintiffs' arguments on this issue have wholly failed to assert facts reasonably showing fraudulent, deceitful, or dishonest representation of union members—the three bases for finding bad faith. Significantly, Plaintiffs offer no cases, or any legal authority for that matter, supporting their argument. Plaintiffs' bad faith allegations are so far afield of our precedent and so lacking in support that they do not warrant further discussion. Put simply, we see no legal or factual basis for asserting a bad faith claim in the instant case.

Second, we also agree with the district court that the facts do not show Chairman Joynt wrongfully discriminated against Plaintiffs. Only "invidious" discrimination breaches the duty of fair representation. "[D]iscrimination is invidious if based upon impermissible or immutable classifications such as race or

other constitutionally protected categories, or arises from prejudice or animus." Considine, 43 F.3d at 1359-60. In large part, Plaintiffs base their discrimination claim on the fact that they were denied re-employment in maintenance of way while other train service trainees (who possessed valid leaves of absence) were allowed to return. At most, this might show Plaintiffs were treated differently than other employees. That mere fact, however, does nothing to suggest why Plaintiffs were treated differently—the crucial question for a duty of fair representation discrimination claim. On that score, Plaintiffs have not pointed to, nor can we find, any record evidence reasonably showing or implying that they were discriminated against because of some immutable characteristic or because Chairman Joynt bore personal prejudice or animus towards them.

Lastly, the district court concluded that no evidence suggests Chairman Joynt acted arbitrarily. "A union's actions are arbitrary only if, 'in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness" as to be irrational.'" Aguinaga, 993 F.2d at 1470 (quoting ALPA, 499 U.S. at 67 (citation omitted)). Plaintiffs contend that Chairman Joynt's advice and dilatory resolution of the overall dilemma satisfy this test.

Based on the current state of the record, there is credible evidence that Chairman Joynt's advice was irrational at the time he gave it. For instance,

during deposition testimony, Plaintiffs' counsel asked Robert Nickens, a Vice

Chairman in the Defendant Burlington System Division union:

> If it's true that Dave Joynt told [the train service instructor] or
> [Plaintiffs] that it didn't matter whether they had a current leave or
> not, as soon as they passed the test, they could not go back to
> Maintenance, would that be, in your understanding, an incorrect
> statement?
>
> [Vice-Chairman Nickens responded:] I will give you my feeling on
> that. That would be impossible. That would be asking David, David,
> does the sun come up in the east or the west, and he says it comes up
> in the west.

Aplt. App. at 87-88. At another point in the deposition, Vice-Chairman Nickens

testified that "I can't even say this straight faced that I would have told a guy,

your leave of absence doesn't matter. It's just incomprehensible." Id. at 93

(emphasis added).

Presumably, and no evidence suggests otherwise, Vice-Chairman Nickens

was familiar with the "factual and legal landscape at the time" the advice was

given. Thus, the testimony raises the possibility that Chairman Joynt's advice

was "so far outside a 'wide range of reasonableness' as to be irrational."

Aguinaga, 993 F.2d at 1470 (quoting ALPA, 499 U.S. at 67 (citation omitted)).

Any other conclusion would effectively read the arbitrary prong out of the duty of

fair representation, at least in bad advice cases, and thereby defy the Supreme

Court's mandate that the "arbitrary, discriminatory, or bad faith" standard apply

"to all union activity." ALPA, 499 U.S. at 67.

To be sure, as Defendant union points out in its brief, Vice-Chairman Nickens does not believe that Chairman Joynt actually told Plaintiffs that their leaves of absence did not matter. But that fact is irrelevant; for purposes of summary judgment we must assume that he did. The only question is whether such advice was arbitrary or irrational at the time it was given. The testimony of Vice Chairman Nickens, reasonably viewed in Plaintiffs' favor, alleges that it was. Hence, there is a genuine dispute of material fact regarding what Chairman Joynt said and whether it was irrational. Consequently, the district court erred in granting summary judgment on this issue.

Nelson v. Holmes Freight Lines, Inc., 37 F.3d 591 (10th Cir. 1994), does not compel a contrary conclusion. In Nelson, this court held that a union representative's bad advice did not breach the duty of fair representation. In relevant part, the employer had accused the plaintiff of stealing. The employer told the plaintiff to resign or else he would be fired and charged with theft. Needing immediate advice, the plaintiff turned to a union representative who was present. The representative told the plaintiff that he could not tell him whether to resign or not, but that if he were in the plaintiff's position, he would not resign. Nonetheless, the representative told the plaintiff that the union would file a grievance either way. The plaintiff resigned and the union filed a grievance. The hearing committee dismissed the complaint, however, because under the terms of

the collective bargaining agreement only discharged employees could bring grievances. See generally id. at 593. In short, the union representative incorrectly informed the plaintiff that he could bring a grievance even if he resigned. Though there are obvious similarities between Nelson and the instant case, there is at least one dispositive difference. In Nelson no credible evidence indicated that the union representative's advice was arbitrary or irrational in light of the legal and factual background, whereas the testimony of Vice-Chairman Nickens supplies such evidence in the case at hand. On summary judgment review, that distinction makes all the difference.

In addition to attacking the substance of Chairman Joynt's advice, Plaintiffs argue that the way he handled their inquiries was arbitrary. Specifically, Plaintiffs assert that Chairman Joynt's eventual resolution of the craft transfer dilemma several months after first discovering the problem—too late to help plaintiffs—amounts to arbitrary or perfunctory conduct. In essence, they claim there is no reasonable explanation for the delay; Chairman Joynt should have investigated and resolved the problem upon first learning about it. Having reviewed the record, however, we conclude that the evidence fails to support a separate claim for arbitrary failure to investigate or for perfunctory conduct. Nonetheless, Plaintiffs may continue to proffer all of their facts on remand in support of the general claim that the advice rendered was arbitrary.

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.